All right, welcome everybody to day two of this happy occasion of our return to you in person. I'm pleased to be joined by my colleagues, Judge Branch to my right, your left, and Judge Lagoa to my left, your right. And just a few rules of the road, most of you have been here before, but we have read your briefs carefully, the underlying record materials, the cases, the statutes, so your time is limited before us today, so I would you don't, if there's a big, long, factual and procedural wind up, we'll probably cut you off and say, okay, let's get going. So just get to it. You probably understand the traffic light system that we have in here. Green, you're good to go. Yellow, you might want to start thinking about winding up. And when the light turns red, just wind up your thought. We're not going to cut you off mid-sentence, but do begin to wind it up. And if for some reason, if we carry you beyond your allotted time, don't sweat it. That's on us, not you. And we won't charge you, for instance, in your rebuttal for the time that we've held you up on your opening. All right, with that, we'll call the first case, which is United States of America v. Gao, 19-12053. Got Mr. Greenlee and Mr. Scheller for the appellants and Ms. McNamara for the appellee. Mr. Greenlee, you're going to lead us off? Yes, Your Honor. Very well. Proceed when ready. Good morning, Your Honors, and may it please the Court. My name is Andrew Greenlee and I represent Kay Gao. Your Honors, this case is fundamentally about the elasticity of the federal wire fraud statute and how far it will stretch before it reaches its breaking point. We believe the statute cannot stretch far enough to cover the conduct at issue in this case. I'd like to start with the Haynes conviction, or the conviction related to the Haynes investment. Haynes attested in his subscription agreement that he was a sophisticated investor. He was apprised of all relevant risks, including the company's lack of revenue and the risk that the company might be undercapitalized. And the company disclosed all of the investors and the amount they invested in the subscription agreement. If this were a civil case, the subscription agreement would protect the defendant from liability based on any contrary statements. In fact, when Haynes attempted to sue the company, he was unsuccessful, probably for that reason. It defies logic that the subscription agreement would offer no protection whatsoever in a criminal proceeding where the defendants are supposed to be afforded greater protections and a higher burden of proof applies. If someone cannot be held liable civilly, they shouldn't be held liable criminally for the same conduct. Now, turning to the Lee County conviction... Can I just ask you a question about the Haynes issue? The former lieutenant governor of Florida, Mr. Kottkamp, never invested a million dollars in VR labs, is that correct? That's correct. Okay, so, and Mr. Gow claimed that Mr. Kottkamp invested a million dollars in VR labs. So, if that statement that seems calculated to lure Haynes into investing, and that's a false statement, couldn't a reasonable jury from that statement infer that Gow intended to defraud Haynes? No, and the reason why is because in the subscription agreement, it lists all the investors and they're on the list. If Haynes had wanted to question Mr. Gow about that statement, he had every opportunity to do so. He didn't do so. He attested that he had read the subscription agreement, that he had all his questions answered, and yet, then he comes into court and testifies to the contrary. Again... Is the relevant question here intent? Is that the element that we're after here with this bit of evidence? Intent to defraud, yes, and I think there's also a, there's a fair notice problem. The reason I ask is that it sounded earlier to me like you were sort of analogizing to what I take to be maybe like the, what might happen in an insurance case or something where the insurance contract doesn't cover something, but you've got an insurance agent, a broker who comes out and says to the insured, oh, don't worry, you're covered. And in a fraud case on the civil side, there might have been an intentional misrepresentation, but then there's a separate element of that tort, reasonable reliance or justifiable reliance, and that's where the written agreement, I think, courts have held will sort of like trump the oral statement. But here, if we're talking about intent, I don't really understand the question, the answer to Judge Branch's question. Well, I think, look, the question is whether a reasonable juror could have found, number one, that there was a misrepresentation, right? I mean, the wire fraud statute doesn't cover, it requires deception or misrepresentation. If this was disclosed in the actual subscription agreement, who invested in the company and how much they invested, I think that should, in fact, trump what was said. Any oral representations that were made by Mr. Gao, we don't even know if he made them. Haynes, of course, testified that he did, but Mr. Gao, we just don't know that the subscription agreement, it's our position, would nullify that contrary representation. So your position is that if Mr. Kottkamp wasn't listed in the subscription agreement, so Mr. Gao could have made representations as to really any number of people that had invested, and if it wasn't in the subscription agreement, then there's no fraud? Well, I think if something is disclosed, if all material facts are disclosed in that actual contract that this gentleman signed, he shouldn't be allowed to come and go behind the contract and say, oh, well, forget about what I signed and I attested to in the contract. Mr. Gao told me over here that this other person, Jeff Kottkamp, invested in the company. I think in the civil context, I don't even think it's really a close call. That risk was disclosed. It shouldn't be the predicate for a wire fraud prosecution. You're importing breach of contract principles into this criminal case? I am. Yes. Yes, Your Honor. I think that a defendant in a criminal case is entitled to some protection when he signs that contract, and I think a criminal defendant should be entitled to the same protections under the law. And if the court were to hold otherwise, first of all, it would create a startling anomaly whereby a civil defendant can be found not to be liable, but a criminal defendant can be found to be liable for the exact same conduct, it would raise intractable fair notice and due process concerns. Your Honors, I'd like to reserve the remainder of my time. Very well. You've got the full three, is this three and a half, Ryan? Yep, three and a half. You've got the full three and a half minutes. All right, Mr. Scheller. Thank you. Good morning. May it please the court. My name is Fritz Scheller and I represent John Williams. Based on the last questions of my esteemed colleague, I will emphasize this case in terms of Mr. Williams is about intent. And the question really is, ultimately, did the government present sufficient evidence, substantial evidence as required under Atkinson to show that Mr. Williams had the intent to defraud? But didn't your client have a fictitious company, like a bottling company that he said he owned and in fact he didn't have one? He did incorporate a bottling company. He did incorporate the bottling company after the Gauss VR labs went through the application process. So in Atkinson, again, the court held, this court held, that substantial evidence is required to sustain a conviction. And so reasonable inferences and credibility determinations have to be found in favor of the government. The Constitution still requires substantial evidence that Mr. Williams had the criminal intent to defraud a company. So you say in your brief several times that the government did not provide or present a sufficient degree, quantity, or quality of competent and reliable evidence, which is what you're arguing now. But apart from saying that generally, you don't explain why that's the case. Could you tell me why it is unreasonable for the jury to infer that Mr. Williams intended to defraud the county? Thank you, Your Honor. Your Honor, yes. Let's look at the lack of evidence. There was no evidence that Mr. Williams was involved in the application process. Both two application processes for the first ones from Lee County. There's no evidence that Mr. Williams knew of the representations that the Gauss made to Lee County concerning VR labs. There's no evidence that Mr. Williams knew the specific limitations and contractual terms of the agreement for the first funding. There's no evidence that Mr. Williams knew that the Gauss had represented they couldn't invest nine million. There's no evidence establishing that Mr. Williams knew that the Gauss did not have the assets. There's no evidence that Williams knew that the Gauss were using his investments. And this is this is the one person in this case who has actually lost money who has been charged. And that's Mr. Williams. There's no evidence that Mr. Williams knew how the Gauss were using his money and his investments. And there's no evidence that Mr. Williams knew that the Gauss use of the money was violating its terms with Lee County. Can I ask you a quick question? Yes. It's a point of the evidence. What was the bit about this message? The cake? Yeah. Sorry to interrupt you. You got it. You knew exactly where I was going. Cake in the file. Yeah. Yes it was like an archaic Western. The government posits that that's direct evidence of criminal intent. But if you think about that email, it's obviously a joke. It actually, I would argue, shows Mr. Williams' lack of mens rea. He's joking about criminal liability with a joke about a cake in a file. Well I mean I guess in fairness the government doesn't need direct evidence, right? I mean like they can pile up a bunch of circumstantial evidence and make a case. Yes. Absolutely, Your Honor. And you can infer from circumstantial evidence. You can infer from a defendant's conduct. But what's critical is when we look at the Cosby v. Jones case. We also look at the 11th Circuit case in the United States v. Kelly. I'm out of time. May I finish my? Yeah, please. Okay. When you look at those two cases, what Cosby v. Jones essentially says is if the evidence to circumstantial weight to a theory of innocence and a theory of guilt by law, the jury has to entertain a reasonable doubt. And so what the reasonable hypothesis of innocence and what the evidence showed in this case and the lack of evidence showed in this case is as the government conceded, Mr. Williams was a true believer. Mr. Williams wanted this company to work. Wanted this company to thrive because this is the way he could recoup the millions he had lost at the hands of the gals. He's one of many bodies left in the gals' wake. And when you think about that, he has to have the company succeed. That is entirely inconsistent with the objective of the gals. Now, the government – and if one last thought, or I can save it for – I'm really stretching it. It is a corollary. But when you talk about his actions with the invoices and so on, I want to turn to Atkinson by the 11th Circuit, and they say – If you're going to turn to Atkinson, I'll let you do that on rebuttal. It sounds like we might have another minute's worth of explanation here. I think that's it. Okay, good. Very well. Very well. One of the hazards of split arguments is that no one has much time, but we'd let you both go over it. I apologize. No, you've got your full time in rebuttal. It's all good. All right, Ms. McNamara. Good morning, and may it please the court, Linda McNamara for the United States. It doesn't matter whether the county or Robert Haynes failed to do their homework or should have known better before buying into the gals' claims, because this court held in United States v. Sveti that a perpetrator of fraud is no less guilty of fraud because the victim is also guilty of negligence. As the Sveti court said, the focus of the language defining a scheme to defraud is on the violator. Again, why is this a criminal case versus just a breach of contract where you have a misrepresentative statement made by a defendant? The gals and Williams were not convicted because they breached a contract. They were convicted because they schemed to use false and fraudulent pretenses to obtain grant funds from Lee County to use for things totally divorced from the grant funds purposes. So the linchpin here is the fact that they accessed public monies? Yes, and used them for a purpose divorced from the beginning, intended, made misrepresentations for the purpose of getting at those grant funds to use for a purpose divorced from the grant funds purposes. They used fraudulent, the gals made false and fraudulent misrepresentations in order to get access to those grant funds, and the evidence showed that Williams was in on it from the start. Now those false and fraudulent misrepresentations started when they first attempted, the gals first attempted to convince Lee County to give them $40 million in bond financing. They made numerous false and misrepresentations with respect to that. Kay Gow even initially submitted an application for the bond financing and grant money using another company's name and financial information as if their company had already merged with that company. Now was that just a mistake as she claimed in her testimony? Or was it an attempt to mislead the county? Because the programs were not intended for startups like VR Labs that had no assets. The jury could reasonably find it was the latter. Now when that financing fell through, the gals fessed up and they said we didn't merge, but that presented a problem. Because as the Lee County Economic Development Director, James Moore, testified, the grant program that they still wanted to get at was not intended to be the end-all, be-all for financing of a new company. So the gals made a variety of additional misrepresentations to cause the county decision makers to believe that even though VR Labs was a new company, it had the financial wherewithal to invest $9 million of its own funds in getting this company going, including $4.4 million in its very first year. Now remember, this is a company that has no assets. Their representations regarding their relationship with herbal science and its supposed success made it seem as if VR Labs was going to be able to hit the ground running and make and market and bottle all these wildly successful products that this Singapore company was supposedly still manufacturing, when in fact the Singapore company had never successfully produced anything and was already closed. And their promises that they would use the grant money only for certain capital expenditures associated with building the type of plant that it would need to create and bottle these products made it seem as if their intent was to use the county grant money only as the county intended and only for permissible purposes. The jury could find that all of these misrepresentations were completely false or intentionally misleading, and it could find that they went to the nature of the gals' bargain with the county, because Moore testified that the county believed the gals' company was of financial strength and substance precisely because it would be investing its own $9 million into the company. The promise to do that came at the gals' suggestion, because they refused to provide any financial information claiming that it was secret. So in order to convince the county that this was a company that could survive, they said, look, we'll promise to invest our own $9 million over the next three years.  What about the argument that the subscription agreement is pretty clear on its face, doesn't show that any of the principals had invested, and not totally unpersuasively, that on the civil side, if this were a fraudulent misrepresentation case under the common law of any of the three states in this circuit, then it might well fail the reasonable reliance. Right. Well, the Sveti court wrote out the reasonable reliance line in the criminal context. The criminal context looks at the intent of the fraudster. And so even if Haynes, when he got that subscription agreement, should have said, hey, wait a minute. This isn't what you told me. That doesn't make the gals' any less guilty of an intent to defraud in the first place. First of all, the fraud had already happened. Robert Gao had already lied in an effort to get him to invest this $500,000. That had already happened. But it could theoretically maybe go to materiality, right? So if the subscription agreement shows there's no investors, and he says, huh, there are no investors. I thought there were investors, but there are no investors. That could go to materiality. But Haynes testified that Robert Gao's representations about the other investors was a big deal to him because it made him feel better about his substantial $500,000 investment, knowing that others had confidence in the company. And he said that it was important to him, given that Robert Gao had refused to permit him to review any of that company's financial information. So that's a jury issue at that point. Whether that was, in fact, material to Robert Gao and whether to Robert Haynes and whether to hold them accountable for fraud in that context. Now, with respect to the evidence of the intent to defraud, that starts with John McClellan's testimony. He was the one who was involved with the Gaus and the Herbal Science Singapore Company. His testimony showed how the Gaus had used that Singapore company as their original cash cow, how they convinced family, friends, and even private equity funds to invest tens of millions of dollars in the company and then had used the money, squandered it on expensive travel, meals, and salaries, and ultimately had driven that company to the brink of bankruptcy before it could produce any successful products. The jury could find from that testimony that it showed how the Gaus operated by convincing investors to sink large amounts of money in their projects and then using the money to live off of rather than to build a successful functioning company. The jury could also find that this testimony showed why the Gaus would have approached the county already harboring an intent to defraud, because they'd already used up the funds associated with herbal science and needed access to cash to continue to live their comfortable lifestyle, and they needed to prop up herbal science while they continued to seek a profitable merger, which seemed to be their ultimate goal. But just getting the grant money wouldn't have done that for them because of the requirements of the county that they proved that this money was being used only for permissible purposes, and that's where the evidence shows John Williams comes in. And for so many reasons, the jury could find that Kay Gaus' insistence on using John Williams to provide the bottling equipment proved Kay Gaus' fraudulent intent from the start and proved Williams' knowing participation in the scheme. First, his involvement basically doubled the price of the bottling equipment without adding anything to the project. This was the single most expensive part of the project, one-fifth of the amount of the grant money. Yet he was a melon farmer with zero experience in creating bottling equipment. Although Kay Gaus testified at trial that the extra cost was justified because Williams' son was supposed to be providing this software to make the bottling equipment more efficient, Williams actually told a different story to the FBI when he was interviewed, explaining that he had doubled the price of the equipment because that's what farmers do, not because of the value of the software. Anyway, there was no evidence that his son ever had the ability to create this million dollars of software or an intent to do so, and in fact, there's no evidence that he ever, certainly never did. To the contrary, long after the county had been billed for all of the bottling equipment and the software, Williams admitted to the FBI that the software remained in his son's head. And it wasn't until the press began questioning the legitimacy of the relationship between VR Labs and Williams Bottling that Robert Gau began sending Williams' son internet articles about what this software was supposedly supposed to do, Wikipedia articles and that type of thing. The jury could find from this evidence that this creation of the software story was a sham and a cover for the fact that Williams was funneling grant money back to the Gaus for purposes that the grant did not permit and that they had intended to do that all along. What about the fact you've got Williams saying, yes, I was involved with the Gaus, I was involved in a business venture with them, I don't know what the Gaus are doing with the county and the grant money, I'm just going in with the Gaus and doing what I do as a businessman and putting my profits in and whatnot. How do you, so where, tell me what the pieces of the puzzle that sort of link him into the fraud. Well, the main thing is, Judge Branch, that there was, the jury could find from the evidence there was no way that he believed that he was chosen for this project to add value, to add a million dollars in value to the project. He had no experience in creating bottling equipment. He had no ability to provide bottling equipment. And the evidence showed that Kay Gau was already in discussions with this company, Apex, it was a company that was really going to make bottling equipment, and she could have contracted, the BR Labs could have contracted directly with this Apex company. But instead, they brought in Williams to do this. Now, Williams had a vested interest in this, of course. He was a true believer. He'd invested over a million dollars with the Gaus companies, and he did want the companies to succeed. But that's evidence of his motive as to why he wanted to get some of this money back to herbal science. His investments were basically in their company, herbal science. The jury could infer that his intent was to profit from what they all hoped would be a great merger between herbal science and an existing company like Thorn Research Labs, which actually makes vitamins and things like that. So all along the way, they were trying to prop up herbal science, to keep it going, keep it going, while in the meantime, they were trying to find somebody to merge with. Now, his intent can be inferred also from things like his creation of this cut-and-paste invoice that doubled the price of a proposal from Apex, not even a contract, but a proposal from Apex, that he gave to Ke Gao, billing almost $1.8 million for the bottling equipment and software before any entity had ever even been hired to make the equipment. Now, at that time, VR Labs had only about $3,000 in its bank account, and Ke Gao hurriedly insured that $710,000 of that invoice that was supposedly due was immediately paid. After receiving that money, Williams almost immediately returned half of it to VR Labs. And then the evidence showed that the Gaos used that money not only their own salaries, but for other things like transferring some to herbal science, things that most assuredly were not qualified capital expenditures. And then the Gaos sought reimbursement from the county as if they had actually used the funds for qualified capital expenditures. And this pattern repeated four times, with Williams creating these cut-and-paste invoices, using actual invoices from Apex, inflating the cost of the equipment that the true bottling subcontractor was charging, the contractor paying Williams' invoice at Ke Gao's direction from line of credit funds, Williams then kicking back significant funds to VR Labs, and Ke Gao using those funds to prop up herbal science and to pay herself, her husband, her daughter, and others. Then, of course, we have this strange use, Williams' strange use of the company, fictitious name Hong Kong Associates, when he was supposedly investing his bottling profits in VR Labs. As I said, Williams was a farmer from Virginia with absolutely no connection to Hong Kong. He'd been investing in the Gaos company for years, always using his own name or a name readily associated with him. If Williams thought there was nothing untoward about what he was doing, why now use a name that had absolutely no connection to him? The likely answer to that comes from the fact that the evidence established that the Gaos had an affinity for Chinese art, traveled to China frequently, and even had an adopted daughter from China. Yet Ke Gao testified that she had no idea why Williams had used that name when transferring funds back to VR Labs. The jury could find from that testimony and all the rest of her two and a half days of testimony was untrue and find that the opposite was true. In this case, that she knew precisely why he was using that name, with the reasonable inference being that she had suggested it to disguise who was actually transferring those funds back to the company. And, of course, he had the incentive to do that because of his investment that he stood to lose. I see my time has expired. If you have no further questions, I will rest on the brief. Okay, thank you very much, Ms. McNamara. Mr. Greenlee, you're back up for three and a half. Thank you very much, Governor. Four quick points. First, with regard to this promise to invest $9 million of their own money, if you actually look at the grant agreement, it says, companies shall make or cause to be made a capital investment, a qualified capital investment in the project of at least $9 million. They devised a way, which was approved by the county, to use their contractor to make the payments and then get reimbursed. So there was no breach of a promise there. Second, the first grant application that was referenced by my friend on the other side, that can't be the basis for a wire fraud conviction because they didn't get any money from that grant application. So that's totally irrelevant. Third, the actual false statements that the government focused on in closing arguments and argued to the jury that the primary basis was the failure to create jobs, to create 208 jobs. But if you look at the grant agreement, it says, counties' remedies for default by the company may include, but shall not be limited to, a claim or suit upon this agreement or both, provided that the company shall not be liable for damages in an amount to exceed any unpaid repayment amount as calculated pursuant to this agreement. So they limited their liability under this contract to paying back the money. That's the remedy, not a criminal wire fraud prosecution. And it's important to note in that regard, they devised a complicated formula as to how, if there were partial performance, how much would be paid back. The companies thought about this. They didn't think about, well, if they don't create the jobs, well, we'll just get the feds to prosecute them. That's not how these matters work. We know from the Blankenship case that breaching a contract cannot be a crime, and yet that's what they were held primarily criminally liable for. It's a legally insufficient basis for a criminal conviction, and under Yates and under Griffin, that standing alone is good enough reason to set that conviction aside. Now I'd like to close by focusing and honing in on the serious, serious federalism concerns that sustaining this conviction would pose. This was purely a state and local matter. The state authorities could have prosecuted. They didn't, so it was turned into a federal criminal prosecution. But the federal criminal code is not designed to ensure investors who risk their money on startup ventures, and it's definitely not meant to enforce contracts between two sophisticated parties who enter into agreement who have already devised the remedies for the breach of that agreement. But isn't really the true nexus here the reason why we're here today is because your clients decided to take a grant from a governmental agency, entity, and as a result of that, they used those monies in a manner that was not agreed upon by the municipality. Right. Well, let me take that up. This is complicated, and I have a minute, but I'm going to try to get through all of it. First, there was nothing under the grant agreement that said you cannot have an investor serve as a subcontractor or a contractor in the case. So Williams was allowed to serve as a contractor. By the way, he wasn't a melon farmer. He was a licensed engineer. So he was qualified to serve as the contractor for this bottling agreement. Second, Williams is allowed to make a profit from that contract. In the same way that GCM, the contractor, he made a profit from his contract, and by the way, he also inflated his invoices. So we're getting into an arbitrary enforcement problem. Why wasn't the contractor also criminally prosecuted, right? So the third part of it is once Williams, who was allowed to reinvest his money into VR Labs, once he did so, VR Labs could use that money as fungible. They could use that money for whatever purpose they saw fit, provided that it was commercially reasonable. So, Your Honors, based on the foregoing due process requires the court to set aside the conviction. This is, first and foremost, a civil matter, and remand the case for the entry of a judgment of acquittal for Kay Gow. Thank you. Very good. Thank you so much. Mr. Scheller. Thank you, Your Honor. I appreciate you compelling me to start off where I wanted to in my last presentation, and that was discussing the case of Atkinson. In Atkinson, it discusses this idea that an individual can act in a way that would further the aims of a conspiracy if that conspiracy would have existed and still not be convicted of the offense, unless you can show an intent and awareness of the agreement and an intent to join into that agreement and create or achieve a criminal objective. That's an important point, because really when it comes down to melon farmers and engineers and so on, really, in the end, what the government complains about Mr. Williams is these invoices that he submitted that he allegedly inflated. Now, we're getting into business practices. If you look at Government Exhibit 21, it was more than just inflating the invoice. There was obviously the software that other individuals testified would have had worth, and there was also a service element to the contract, a goods element to the contract. That's Exhibit 21. The point is the government, the evidence, failed to show Mr. Williams' agreement with the Gaos to defraud the county. The government, in their argument today, stated the Gaos wanted to enrich themselves. In their brief, they talk about buying cars or leasing cars and having expensive dinners and so on. At the same time, they say Mr. Williams is a true believer. He wants his company to work so he can recoup on his investment. Those aims, there's no meeting of the minds there. And so what they say is, and I think the case of Tackle Off is especially important in this case, they talk about this idea that this best business practices or this chicanery or this deception of Mr. Williams with his invoices, that's not enough for criminal liability unless there's an intent to harm the county. Mr. Williams needed VR Labs to satisfy the contract in order for the company to succeed. So maybe he may not have had the best business practices with the invoices, but in the end, there wasn't an intent to harm the county. He needed this to work. Government points to his use of this fictitious company, Hong Kong Investments, to reinvest the money. Use of entities as investment vehicles by itself are innocuous. In the brief, the government says the use of fictitious names shows criminal liability and cites the case of United States versus Ireland. If you read that case, it's radically different from Mr. Williams' situation with Hong Kong Investments. I would refer to Defense Exhibits 62 and 63. On the Hong Kong Investments, Mr. Williams' name and address is listed. It's accessible online, public record. In the Ireland case, it was a steroid dealer who was using false names and false addresses to send out steroids. It's a completely different situation. The bottom line is, and I want to respond to Judge Branch's first question today. I thought it was an important question. And I want to end on some of the facts. I talked about the lack of evidence, but I also want to just end with the facts that I think support Mr. Williams' theory of innocence, reasonable and open. He wanted VR Labs to succeed. He invested his own money into the Gauss businesses, more than a million dollars, was never personally enriched, actually lost money through the Gauss. Gauss had consistently taken advantage of other corporate investors all along the way. And, of course, they took advantage of this melon farmer, this dupe. He was a perfect dupe. He came in well after the contract with Lee County was signed. Can I just? I'm really abusing my privilege today. Let's wind it up. I think we have it, but go ahead. And he had everything to lose if the company failed to meet its contract. Your Honor, again. Your Honors, excuse me. Again, this is about a sufficiency of intent, an intent to defraud. Very well. Thank you. Thank you both. Thank you all. That case is submitted and we'll move to the second.